DREW, J.
11 Lanny James originally filed a petition for injunction and damages against his neighbors, John and Wanda Witherington, requesting that they be enjoined from keeping and maintaining dogs on their property. James asserts that Sammie, the Witheringtons’ Sheltie dog, constantly barked and yipped, causing a great deal of nuisance to him and the surrounding community. James also claims another dog belonging to the Witheringtons, T.J., is dangerous and should have preventive measures taken against him to keep him from attacking other dogs, such as being enclosed in a fence instead of allowing him to roam around the neighborhood. James asserts Sammie’s barking has prevented him from enjoying outdoor and indoor activities on his property. James later amended his original petition to allege that another of the Witheringtons’ dogs, B.B., was also a nuisance because of his incessant barking.
Trial was held in April 2011 and judgment was rendered in favor of the Wither-ingtons. The court ruled that because Sammie did not bark during the nighttime hours, James was not being deprived of sleep. This, coupled with the fact that the court could find no evidence that James sought medical attention for anything associated with the barking, made him ineligible for damages. The court also held that the issue with Sammie’s barking was moot as the Witheringtons had permanently given the dog away. Finally, the court held that James had not met his burden of proving that T.J. was dangerous and that enjoining the Witheringtons from owning any dogs would be unnecessary and unreasonable. James now appeals.
| ¿TESTIMONY
Lanny James
Lanny James, plaintiff, testified that:
• he and the Witheringtons enjoyed a friendly relationship as neighbors, until the barking problem became intolerable;
• upon the death of Mrs. Witherington’s father in the spring of 2009, James visited the family and brought food and his condolence;
• the nuisance actually began when the Witheringtons acquired a Sheltie (“Sammie”) in late 2008, but he made no protest initially, because of the emotional trauma recently suffered by the Wither-ingtons;
• Sammie was left outside early in the morning when defendants would leave for work, and the dog would bark and yip throughout the day, until they returned home, causing a great deal of frustration;
• Sammie’s daytime barking caused him to lose his desire to engage in outside activities, such as sunbathing and fishing off his dock;
• the dog’s barking was often louder than the television inside his home;
• the constant barking rendered useless his in-home recording studio;
• he asked John Witherington to quell the barking;
• Witherington agreed, but Sammie continued to be a nuisance;
• he purchased a barking control device, which transmits a high-pitched sound designed to curb a dog’s barking, to no avail;
• his subsequent request for relief from his neighbors was met with Mrs. Withering-ton’s unhelpful suggestion that he purchase ear plugs;
• The Witheringtons also owned two other overly vocal dogs;
*584 • after contacting the Witheringtons several times, he hired an attorney to draft a letter asking them to provide some relief;
• even after the Witheringtons received the letter, the barking did not lessen in frequency or pitch, which led him to file suit;
| a* he never visited a physician for sleep deprivation regarding the barking;
• T.J. was an aggressive “attack dog”[1] that was allowed to freely roam the neighborhood, attacking his Dachshund on perhaps 10 occasions;
• B.B. was a nuisance due to barking and would often accompany T.J. on his misadventures throughout the neighborhood; and
• his new dog has been attacked three times by T.J., since defendants still allowed him to roam free.
Sandra Prince
Sandra Prince testified that upon visiting her brother for a week, the incessant barking prevented her from being able to enjoy even the shortest amount of time outside her brother’s lake home. Prince testified that she could not stand more than 10 minutes outside before the annoyance of the barking simply drove her inside. This happened on the first and second day of her stay, so for the remainder of the trip, Prince stayed inside to avoid the shrill yelps and barks.
Thomas O. Sutton
Sutton testified that, as a neighbor, he was friends with both James and the With-eringtons. He testified that he had heard the Witheringtons’ dogs bark on occasion even though he was 150 yards away. Sutton asserts that the barks were shrill and at times could even be heard inside his house but only faintly. Sutton testified that he witnessed the Witheringtons’ dog attack another dog, which belonged to his friend Dixie Ramsay. This was the only instance in which he had witnessed T.J. being aggressive. Sutton | testified that he never contacted the Witheringtons about the barking or the attack that he witnessed on his friend’s dog.
Wanda Smith Witherington
Witherington testified that she purchased the Sheltie called Sammie for her granddaughter, Milan, around Easter, using money that Milan earned doing household chores when she lived with them. Witherington testified that they put Sammie outside in the mornings when they left for work. She testified they went to great lengths to appease James’ anger about the barking. The first step was to install the barking tool James had purchased for them. When the Witheringtons realized it was ineffective, they gave it back to James and purchased a shock collar, which was also unsuccessful.
Witherington testified that they then enrolled Sammie in an obedience school and got her medicine for animals with separation anxiety. None of these attempts to suppress the barking worked, and she testified that James’ anger intensified and even led to what she considered a threat when James stated that “he would handle it (the barking) in another manner.” Mrs. Witherington testified that her family was in the midst of a crisis because of sudden deaths occurring in a short amount of time and this distress led her to tell James to buy ear plugs.
Witherington testified that as a result of the increasing complaints from James, they kept Sammie inside and eventually gave the dog away to family friends to *585 appease James. Witherington testified that T.J. and B.B. were good natured but bold dogs that did nothing more than protect their property and bark occasionally like the other dogs in the neighborhood. She | «added that she did not know about T.J.’s attack on Ramsay’s dog until Ramsay called to inform them several months later. Witherington stated that no one besides James or Ramsay had ever told her T.J. was aggressive. She also stated that measures had been taken to secure T.J. in a fence, as well as tethering while in the yard, but that as result of her elderly mother’s slow pace while entering and leaving the fenced-in yard, at times T.J. escaped. The Witheringtons built another gate in the fence to stop this occurrence.
Witherington asserted that even after putting Sammie in her house before giving her away for good, James still proceeded with his complaints by contacting an attorney and later filing suit. Witherington testified that the dogs’ barking never disturbed her, her husband, or granddaughter. Witherington testified that on one occasion, James called the sheriff to complain about B.B.’s barking; when the deputy arrived, she quickly put the dog inside the house to appease James and the officer.
Tony Edgar Smith
Smith is Mrs. Witherington’s brother and lives about 100 yards away from the Witheringtons’ house. Smith testified that he had heard the Sheltie bark before, but not from inside his house. He also testified that it was common to hear dogs bark in his neighborhood as there were so many. Smith asserted that he had never seen T.J. be aggressive toward anyone or even heard T.J. bark. Smith testified that he spent time between Lake D’Arbonne and another home in Tyler, Texas, but that while in Louisiana, he would spend a great deal of time around the Witheringtons’ property.
| «DISCUSSION
James asserts that the trial court erred by not enjoining the Witheringtons from keeping dogs on their property and thus abating this nuisance. He asserts that even after receiving a letter from his attorney, the Witheringtons refused to quell Sammie’s barking and continued to allow their “attack dog” T.J. to roam the neighborhood freely. The Witheringtons claim they had already sent Sammie to live with another family permanently before suit was filed. James disputes this and argues he would not bring suit against someone to force them to do something they had already done.
In Robertson v. Shipp, 50 So.2d 699 (La.App. 2d Cir.1951), the court recognized that the barking, howling, and whining of dogs may constitute a nuisance and may be enjoined if the barking results in serious annoyance to neighboring residents and interferes with the reasonable use and enjoyment of their property. The court recognized that one dog is enough to be a nuisance. The Witheringtons assert that because James did not show any irreparable harm as a result of the barking, he was not entitled to an injunction or damages; however, Robertson dismissed this same argument by stating that no one could be expected to continuously experience such a nuisance for a sum of money.
In Ryan v. Louisiana Soc. for Prevention of Cruelty of Animals, 62 So.2d 296 (La.App.Orl.Civ.1953), the defendant nonprofit organization, which was running an animal shelter, was enjoined because the dogs kept there were a nuisance to the nuns living in a convent next door. The constant barking kept them from sleeping, and a permanent injunction was [7issued against the nuisance and affirmed on ap *586 peal. The court in Hernandez v. Richard, 2000-471 (La.App. 3d Cir. 12/6/00), 772 So.2d 994, issued a preliminary injunction against a defendant whose 17 dogs kept barking continuously and became a nuisance to a neighbor who lived 250 yards away. The court held that the frequent barking of the dogs constituted a nuisance which would be abated by an injunction.
In the instant case, James complained of the barking of two dogs, not the 17 in Hernandez, which would be exponentially louder than the barking of the Withering-tons’ dogs. James admitted that the barking did not occur during nighttime hours, which is a distinct contrast to the situations of both the Ryan and Hernandez situations.
James also claims that the trial judge erred when he did not enjoin the Wither-ingtons from allowing their dog T.J. to roam about the neighborhood freely because he is a dangerous dog. La. R.S. 14:102.14 defines a “dangerous” dog as any dog unprovoked on two occasions within 36 months, that has killed, seriously bitten, inflicted injury, or otherwise caused injury to a domestic animal off the property of the dog’s owner. It also states that it is unlawful for a person to own such a “dangerous” dog without properly confining or restraining it. James asserts that T.J. had attacked his dog on several occasions on his property.
James also asserts that T.J. has caused serious harm to other animals, most notably, Dixie Ramsay’s dog. The Withering-tons claim they did not learn of the attack on Ramsay’s dog until months after it had occurred, and that James can provide no proof that T.J. ever attacked his dog or why T.J. |sshould be considered dangerous. James asserts that he should not have to be afraid to let his dogs out for fear of T.J.’s attack and that the Witheringtons should take the action of confining the animal in a fence. James argues that the court should award him damages for the loss of sleep and enjoyment of his property he has suffered as a result of the dog’s barking. We note that James never visited a doctor to aid in his endeavor for more or better sleep and, therefore, has proven no damages.
While the trial court has broad discretion in deciding whether to grant injunc-tive relief, preliminary injunction is an extraordinary remedy and should be issued only when the party seeking it is threatened with irreparable loss without adequate remedy at law. La. C.C.P. art. 3601; Chandler v. State, 2002-1410 (La.App. 1st Cir.3/28/03), 844 So.2d 905. In the case at hand, James could not establish such grievous harm as would justify in-junctive relief. While we have sympathy with plaintiffs claims of annoyance, the defendants did take some steps to ameliorate the situation, and we do not feel this is an appropriate situation for an injunction.
In Myer v. Minard, 21 So.2d 72 (La.App. 2d Cir.1945), a somewhat analogous case, this court held that the crowing of a rooster was not a nuisance which constituted sufficient justification for injunctive relief, as this was a sound that all animals of that species naturally produce.[2]
*587 [flHere, the dogs, just like the rooster, were simply producing the sounds that came naturally to them. These barks were no different than those of any other dogs, including those owned by James. The barking did not conflict with James’ sleep. The trial court was eminently correct in declining to award any damages.
Further, this record does not establish any irreparable harm, and we find that the trial court was correct to deny the request for injunctive relief.
DECREE
For the foregoing reasons, and at the costs of appellant, the judgment is AFFIRMED.

. There are detailed procedures in Title 14 by which to seek a declaration that a particular dog is dangerous or vicious. See La. R.S. 14:102.12-102.18.

. As stated by this court, at 76-77:
We cannot conceive of a normal person, endowed with ordinary sensibilities and ordinary habits, being greatly discomforted by the announcement of a new day from the well-trained voice of a stately cock, the sound of which is used as a symbol of good cheer by many advertisers. The voice of the rooster can be heard daily in motion pictures, on the radio and at the birth of a new day all over the world, whether in the country, town or city, one only has to awaken to hear the cheery voice of Chantecler announce the day. He has been doing that *587 all over the world since before the year 1 and, so far as we can find, no one has until now tried to silence his cheerful greetings.
The time for this action is most inopportune, with the Government taking for the Armed Forces of our Nation all the broilers, friers, excess hens and eggs from our large poultry-producing centers, as well as a great part of the beef and other meats, and the Agriculture Department at Washington urging everyone to raise poultry, eggs, Victory gardens and other foods. The figures given out at Washington showing the quantity of vegetables produced and canned from Victory gardens last year were astounding and the figures, if given, showing the number of chickens raised and eggs produced in back yards of towns and cities would be more astounding. If we destroyed the roosters, within a very short time the chicken family would become extinct and the familiar American breakfast of bacon and eggs would be no more.
The rooster and his crow, besides being the symbol of good cheer and happiness, have been made use of for many purposes as far back as centuries go. The Indonesian seafarers made use of them on their ships to keep the man-eating sharks away. When the rooster crowed aboard ship — and every ship carried one or more — the sharks thought they were near land and, through fear of being washed ashore to lie there and die, swam away from the ship thereby relieving the seamen from their menace. Without further proclaiming the cheerful and gallant qualities of the big red rooster, we are convinced beyond a reasonable 'doubt that the cheery outbursts at the break of day cannot be so disturbing as to become a nuisance to a normal person of ordinary sensibilities and of normal habits and tastes, and that to continue to allow the rooster to crow is not in derogation of the rights of the plaintiffs.